IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMES C. SCHUSTER,

    Plaintiff,

       v.

                                CIVIL ACTION FILE
                                NO. 1:05-CV-239-TWT

HENRY COUNTY, GEORGIA, et al.,

    Defendants.

ORDER

      This is a First Amendment retaliation action.  It is before the Court on the

Defendants' Motion for Summary Judgment [Doc. 63].  For the reasons set forth

below, the Defendants' motion is GRANTED.

I. BACKGROUND

      This case arises out of the termination of Plaintiff James Schuster's

employment by Defendant Henry County.  Beginning in May 1999, the Plaintiff

worked as Henry County's Director of Finance.  Defendant Linda Angus took office

as County Manager in January 2003.  As part of her contract, which was approved by

the Henry County Board of Commissioners ("the Board"), she received (1) an initial

salary of $110,000, (2) $10,000 in moving expenses, (3) a $600.00 monthly travel

allowance, and (4) a $35,000 fixed rate (1.6%) loan to finance the down payment on

a new home in Henry County.  The Plaintiff believed that the moving expenses and travel allowance were subject to withholding tax.  He also believed that the loan violated Georgia law.  Schuster was not consulted about this contract before it was approved, however.  Instead, Leland Maddox, former Chairman of the Board, personally ensured that $45,000 was wired from the County's coffers to Angus's bank account on January 13, 2003.

Upon reviewing the terms of the contract, Schuster took several steps in protest of this agreement.  First, he consulted with the County Attorney, David Brenskelli, about his concerns, questioning whether the $10,000 moving expense payment should have been classified as compensation for tax purposes and whether the loan to Angus was legal under Georgia law.  According to Schuster, Brenskelli commented only that Maddox had drafted the contract and that it was thus a "done deal."  (Schuster Dep. at 177.)  The Plaintiff claims that he continued to investigate the propriety of this transfer, however, and contacted the County auditors to confirm that the travel allowance was taxable. (Bush Dep., Ex. 3.)  Thus, when Angus received her February 2, 2003 paycheck, she noticed that taxes had been deducted for the monthly travel allowance.  Because she did not believe this money was taxable, she contacted Schuster and asked him to review her contract and "make certain this is correct." (Angus Dep., Ex. 19.)  There is no evidence that the parties ever discussed this issue

again.  According to the Plaintiff, he met with Angus on February 20, 2003, at which time she instructed him to consider transferring to another position.  (Angus Dep., Ex. 18.)  She subsequently informed Michael Bush, the County's Chief Accountant, that he would be acting as Finance Director.  She also told Bush that she wanted to make sure her travel allowance was paid pretax.  Bush told her that in order to do as she requested, he needed her to provide him with documentation.  (Bush Dep. at 48.)  According to Bush, she never provided him with documentation so tax continued to be withheld from this allowance.  (Id. at 49.)

In March 2003, the Plaintiff was transferred from his position as Director of Finance to Finance Manager for the County's Special Purpose Local Option Sales Tax ("SPLOST").  (Bush Dep. at 59.)  While working in that position, the Plaintiff alleges that he discovered errors in the way the Board managed the SPLOST budget. Specifically, he realized that the Board had repeatedly reallocated funds among projects without amending the SPLOST budgets in public session.  He appeared before the Public Works Committee in August 2003 to explain this problem and then tried to get on the agenda before the entire Board.  His presentation was submitted to the Board in December, but according to him, Angus "tabled" this issue because "she wanted her budget people to look at it first."  (Schuster Dep. at 218.)

In January 2004, the Plaintiff's position at SPLOST was eliminated, and he was not offered any alternate position of employment with the County.  The Plaintiff appealed to Angus, but she affirmed the decision to eliminate his position.  He then appealed to the Board, but they declined to review Angus's decision.  The Plaintiff subsequently filed an action with the Henry County Superior Court seeking review by certiorari of the County's termination decision, but the court found that he had failed to appeal Angus's decision within the 30 day statute of limitations.

On January 27, 2005, the Plaintiff brought this lawsuit, claiming that the Defendants violated his First Amendment rights by firing him in retaliation for his speech on matters of public concern.  He also pled a corresponding state law claim under the Georgia Constitution.  The Defendants previously moved to dismiss these claims as barred by the Rooker-Feldman doctrine.  In a December 8, 2005 order, this Court denied the Defendants' motion.  The Defendants now move for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court should view the evidence and any inferences that may be drawn in the light

most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

III. DISCUSSION

A. Rooker-Feldman Doctrine

The Defendants again argue that the Court has no jurisdiction over this matter under the Rooker-Feldman doctrine.  This doctrine, arising out of the two Supreme Court cases for which it is named, generally precludes a plaintiff from bringing in federal court claims that have already been decided in a state court proceeding.  See District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923).  The scope of this doctrine was narrowed, however, by the Supreme Court's recent decision in Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005).  Based on that opinion and a subsequent Second Circuit decision, Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 85 (2d Cir. 2005), this Court found that the doctrine did not apply in this case because the Plaintiff was not complaining of injuries caused by a state court judgment and asking

this Court to review and reject that judgment.  (Order of December 8, 2005, at 6-9.)

The Defendants now argue that because the Eleventh Circuit, in several unpublished

opinions, has failed to acknowledge that <u>Exxon Mobil</u> narrowed the scope of the

doctrine as held by the Second Circuit in <u>Hoblock</u>, this circuit's previous Rooker-

Feldman analysis continues to control.  <u>See</u> <u>Amos v. Glynn County Bd. of Tax</u>

<u>Assessors</u>, 347 F.3d 1249, 1265 n.11 (11th Cir. 2003) (examining whether: (1) the

party in federal court is the same as the party in state court; (2) the prior state court

ruling was a final or conclusive judgment on the merits; (3) the party seeking relief

in federal court had a reasonable opportunity to raise its federal claims in the state

court proceeding; and (4) the issue before the federal court was either adjudicated by

the state court or was inextricably intertwined with the state court's judgment).[1]

     As this Court stated in its order denying the Defendants' motion to dismiss,

however, these Eleventh Circuit cases were not published and are thus non-binding.

---

[1]In its previous order the Court cited <u>May v. Capote</u>, 2005 WL 2203148 (11th Cir. Sept. 12, 2005) and <u>Industrial Commc'ns and Elecs., Inc. v. Monroe County</u>, 134 Fed. Appx. 314 (11th Cir. 2005).  Since then, the Eleventh Circuit has issued several additional unpublished opinions on Rooker-Feldman that mention <u>Exxon Mobil</u> but continue to apply the four part test from <u>Amos</u>.  <u>See</u> <u>Morris v. Wroble</u>, 2006 WL 3326752, at *2 n.4 (11th Cir. November 16, 2006) ("We do not decide whether <u>Lance</u> or <u>Exxon Mobil</u> require us to modify in any way our above four-part <u>Amos</u> test, because Mrs. Morris's claims fail under either test."); <u>Force v. Kolhage</u>, 2006 WL 2329365, at *1 (11th Cir. August 11, 2006) (applying the <u>Amos</u> factors); <u>Mickens v. Tenth Judicial Circuit</u>, 2006 WL 1388735, at 6 (11th Cir. May 22, 2006) (same); <u>Ransom v. Georgia</u>, 2006 WL 1313171, at *1 (11th Cir. May, 12, 2006) (same).

Accordingly, this Court must on its own construe the Supreme Court's holding in Exxon Mobil and apply it to the present dispute.  The Court thus adopts the reasoning from its December 8, 2005 Order and again concludes that the Rooker-Feldman doctrine does not apply here.

    B. Federal Claims

    The Plaintiff contends that his firing was in retaliation for exercising his First Amendment right to protest the terms of Angus's employment contract.  Public employment may not be conditioned upon requirements that violate constitutionally protected interests.  Connick v. Myers, 461 U.S. 138, 142 (1983).  Although a public employee maintains the right to freedom of speech, because the state, as an employer, has an interest in regulating the speech of its employees, the protections afforded the public employee under the First Amendment are not absolute.  Chesser v. Sparks, 248 F.3d 1117, 1122 (11th Cir. 2001).  Accordingly, to establish a prima facie case of retaliation under the First Amendment, a public employee must show:

> (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee.

Battle v. Board of Regents for Ga., 468 F.3d 755, 760 (11th Cir. 2006) (quoting Anderson v. Burke County, Ga., 239 F.3d 1216, 1219 (11th Cir. 2001)).  Once the

Plaintiff demonstrates these elements, the burden then shifts to the employer to show by a preponderance of the evidence that "it would have reached the same decision...even in the absence of the protected conduct." Id.  The first two factors are questions of law requiring the Court "to determine whether the First Amendment protects the employer's speech," while the second two are issues of fact "designed to determine whether the alleged adverse employment action was in retaliation for the protected speech." Anderson, 239 F.3d at 1219.

In order to make a prima facie case, Schuster must thus demonstrate that his speech was on a matter of public concern.  The Supreme Court has recently addressed the issue of what qualifies as protected employee speech. See Garcetti v. Ceballos, 126 S. Ct. 1951 (2006).  In Garcetti, the plaintiff, an assistant district attorney in Los Angeles County, served as a calendar deputy whose duties included advising his supervisors on how best to proceed with pending cases.  Pursuant to that job function, the plaintiff investigated the accuracy of an allegedly improper affidavit used to obtain an arrest warrant in a pending prosecution.  After completing his investigation, the plaintiff notified his supervisors, orally and in a written memorandum, of his belief that the affidavit contained serious inaccuracies and, consequently, that he recommended dismissal of the case.  The plaintiff alleged that following his report he

was subjected to a series of retaliatory employment actions in violation of his First and Fourteenth Amendment rights.

Addressing whether the plaintiff spoke as a citizen on a matter of public concern, the Supreme Court emphasized that the "controlling factor" in the determination was that the plaintiff's "expressions were made pursuant to his duties as a calendar deputy." Id. at 1959-60. This opinion failed to establish, however, how broadly a court should define the scope of actions that are part of an employee's official duties. The Plaintiff contends that this definition should be restricted to only those activities that are part and parcel of the employee's "day-to-day" responsibilities. (Pl.s' Resp. to Mot. for Summ. J., at 17.) The Eleventh Circuit's more recent decision in Battle rebuts this assertion. There, a financial aid officer at a state university observed and documented alleged fraud in the Federal Work Study Program. Specifically, she discovered what she believed to be fraudulent mishandling and mismanagement of federal financial aid funds and confronted several employees and supervisors, including the university's president, regarding these alleged infractions. When the university declined to renew her contract, she filed a lawsuit alleging that she had been retaliated against for speaking out against this fraud. The Eleventh Circuit concluded, however, that her actions were taken pursuant to her official duties as a financial aid counselor and thus did not entitle her to First

Amendment protection.  Specifically, the court noted evidence that: (1) the plaintiff had admitted she "had a clear employment duty to ensure the accuracy and completeness of student files as well as to report any mismanagement or fraud she encountered in the student financial aid files"; and (2) the Department of Education's guidelines explicitly required financial aid workers to report any suspected fraud.  Id. at 761.  Furthermore, the Eleventh Circuit was dismissive of the plaintiff's argument that her speech was protected because fraud discovery and reporting were not activities she performed on a daily basis.  The court stated:

> Regardless of whether Plaintiff had a duty to look for fraud, these assertions do not alter the uncontroverted fact that once Plaintiff did discover mismanagement or fraud within any of the student files, she had a clear duty to report this information. The issue in Garcetti was whether a public employee was speaking pursuant to an official duty, not whether that duty was part of the employee's everyday job functions.

Id. at 762 n.6.

This Court concludes that in order to demonstrate First Amendment protection, a public employee must be able to show that his speech did not rest within the foreseeable scope of duties he was expected to perform on behalf of his employer. This is consistent not only with Battle, but with other recent circuit opinions. In Williams v. Dallas Indep. Sch. Dist., 2007 WL 614212 (5th Cir. Feb. 13, 2007), for example, the Fifth Circuit analyzed several decisions since Garcetti, including Battle, and found that these cases distinguished "between speech that is 'the kind of activity

engaged in by citizens who do not work for the government,' and activities undertaken in the course of performing one's job." Id. at *4 (quoting Garcetti, 126 S. Ct. at 1962); see also Freitag v. Ayers, 468 F.3d 528 (9th Cir. 2006) (concluding that the First Amendment did not protect a prison guard's internal complaints documenting her superior's failure to respond to inmates' sexually explicit behavior toward her); Mills v. City of Evansville, 452 F.3d 646, 648 (7th Cir. 2006) (finding that a police office's negative remarks following an official meeting to discuss plans to reorganize the department were not protected speech).

In examining this distinction between speech engaged in by private citizens and speech within the scope of employment, this Court is also persuaded by the Tenth Circuit's decision in Green v. Board of County Com'rs, 472 F.3d 794 (10th Cir. 2007). There, a drug-lab technician at a county juvenile justice center, who performed drug-screening tests as part of her job, became concerned that the center did not have a confirmation drug testing policy. Id. at 796. She raised these concerns with her supervisors, but they failed to respond. She thus decided to pursue this issue further on her own and, without consulting her superiors, contacted the manufacturer of the drug-testing equipment with her questions and set up an independent test at an outside hospital. Id. She also spoke with representatives from the Department of Human Services and arranged for one of their case workers to deliver the sample to the

hospital.  <u>Id.</u>  This test ultimately confirmed her suspicions and resulted in the center's adoption of a formal drug test confirmation policy.  Following these events, the plaintiff claimed that her supervisors began to treat her less favorably and ultimately terminated her employment.  <u>Id.</u>  She thus brought a section 1983 action alleging that the county's representatives had retaliated against her in violation of the First Amendment.  On appeal, the Tenth Circuit found that her speech was more like the non-protected activities in <u>Garcetti</u>, <u>Battle</u>, <u>Mills</u>, and <u>Freitag</u>, noting that she was not communicating with newspapers or legislators or "performing some similar activity afforded citizens; rather, even if not explicitly required as part of her day-to-day job responsibilities, her activities stemmed from and were the type of activities that she was paid to do."  <u>Id.</u> at 800-01.

Turning to the case at hand, the Court finds that to create a jury issue of retaliation, the Plaintiff must demonstrate that his protest of Angus's contract was not within the scope of foreseeable activities he would undertake in the course of his job. The evidence does not support this conclusion.  The job description for Finance Director stated that this employee had "ultimate responsibility for the County's financial management and acts as the supervisor for all financial and operational

activities of the County's governmental funds."[2]  (Defs.' Mot. for Summ. J., Ex. C.)

More importantly, the Plaintiff's contention is directly contradicted by his own

deposition, in which he stated:

> I have an obligation, a stewardship function in the nature of the job.  I
> have an obligation as a CPA, <u>as a finance director</u>, as a professional, to
> make sure the transactions are classified properly so the records are
> accurate, so they maintain the credibility in the public's eye.

(Schuster Dep. at 186) (emphasis added).  He further stated that he was required to

continue to investigate the financial issue until he received "independent

confirmation."  (<u>Id.</u> at 187.)  The Plaintiff's summary of his job responsibilities is

confirmed by other County officials.  Angus stated that she expected Schuster, as

Finance Director, to understand the financial obligations of the County's contracts,

including her employment agreement and to inquire as to its legality.  (Angus Dep. at

62-64.)  Jason Harper, current Chairman of the County Board, stated that it was the

responsibility of "Schuster or the payroll" to determine whether a stipend or moving

expenses should be treated as taxable income.  (Harper Dep. at 41.)  This evidence

thus demonstrates that both Schuster and his employer expected him to confirm the

legitimacy of any payments coming out of the County coffers.

---

[2]The Court is mindful of the fact that "job descriptions often bear little
resemblance to the duties an employee actually is expected to perform."  <u>Garcetti</u>, 126
S. Ct. at 1962.

In a later-filed affidavit, however, the Plaintiff appears to backpedal from his own assessment of his duties, claiming that after 2000, his role was diminished to "just implementing, budgeting, and accounting for the various transactions approved by the Board." (Schuster Aff., ¶ 4.) To the extent that this statement conflicts with his previous deposition, the Court disregards it. See Huddleston v. R.J. Reynolds Tobacco Co., 66 F. Supp. 2d 1370, 1373 (N.D. Ga. 1999) (holding that an affidavit that contradicts the affiant's prior sworn deposition testimony cannot be used to thwart a motion for summary judgment) (citing Van T. Junkins and Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 658-59 (11th Cir. 1984)).

Schuster also draws attention to the fact that he went "outside his chain of command" to County Attorney Brenskelli to discuss the personal loan from the County and the $10,000 in moving expenses. (Pl.'s Resp. to Mot. for Summ. J., at 18; Schuster Dep. at 176-77.) His assertion that this communication somehow severed any connection between his speech and his job is misguided. He himself stated that his obligation as Director of Finance required him to receive "independent confirmation" as to whether these provisions in Angus's contract were properly characterized. (Schuster Dep. at 187.) According to him, he received that confirmation regarding the treatment of the $10,000 in moving expenses after speaking with the County auditors. (Id. at 179-81, 188.) However, when asked

whether he ever confirmed the legitimacy of Angus's mortgage loan, he testified that "I did not get confirmation, because I was transferred within weeks, maybe two." (Id. at 188.)  Certainly, if he had been acting as a private citizen, he would have continued to pursue the matter even after moving into SPLOST.  See Garcetti, 126 S. Ct. at 1960 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created.").  Here, the Plaintiff's own testimony confirms that he was investigating the legitimacy of these transactions because he believed it to be one of his job responsibilities as County Finance Manager.  Indeed, Schuster had a self-affirmed duty to "make sure that the books are accurate, credible, so that when we publish financial statements, they are credible and that the public believes it's properly reported to." (Schuster Dep. at 182.)  The Court thus concludes that these actions by the Plaintiff are not entitled to First Amendment protection.

The Plaintiff identifies one other example of allegedly protected free speech that he contends caused the Defendants to eliminate his job with the SPLOST program.[3]

---

[3]In the "Statement of Facts" section of his brief, the Plaintiff also cites to statements from his recently-filed affidavit.  First, he testifies that he posted messages on several websites throughout his tenure as Finance Director and engaged in discussions with other bloggers "about the financial condition of the County and the SPLOSTs funds." (Schuster Aff., ¶ 2.)  He further states that, on the day after the

He alleges that he was retaliated against because Angus discovered that he planned to voice his concerns regarding the Board's failure to formally amend the budget before reallocation and spending of SPLOST funds.  The Court finds that such activity is within the scope of responsibilities of the finance manager for the SPLOST department.  Indeed, just as the plaintiff in <u>Battle</u> was required to report fraud even if was not a day-to-day responsibility, a SPLOST finance manager would be required to report improprieties in the way that the Board was conducting SPLOST business. Moreover, even if the Court assumes that the Plaintiff's speech qualifies as a matter of public concern, he has failed to provide any evidence indicating that this speech played a role in the decision to eliminate his position.  The Eleventh Circuit has identified the following factors to consider in determining whether an employee's speech played a substantial part in the employer's decision:

---

$45,000 wire transfer to Angus was completed, he was called into a meeting with Maddox, Angus and Harper and asked if he knew the identity of a blogger who used the name "Bugs Bunny."  (Schuster Aff., ¶ 8.)  According to the Plaintiff, these County officials claimed that this individual had posted the terms of Angus's contract on the website and Maddox concluded that someone in the Plaintiff's department must have done it.  (<u>Id.</u> ¶ 8-9.)  Schuster claims that this meeting was intended to send him a "not so subtle" message that he should not speak out publicly.  (Pl.'s Resp. to Mot. for Summ. J., at 6.)  These statements are not mentioned anywhere in his Complaint or in the Argument section of his brief, however.  The Court thus concludes that the Plaintiff is not claiming that he was fired because of this speech and declines to address these allegations.

(1) the temporal proximity between the termination and the protected activity; (2) whether any reasons for the termination were pretextual; (3) whether any comments made, or actions taken, by the employer indicate the discharge was related to the protected speech; (4) whether the asserted reason for the discharge varied; and (5) any circumstantial evidence of causation, including such facts as who initiated any internal investigations or termination proceedings, whether there is evidence of management hostility to the speech in question, or whether the employer had a motive to retaliate.

Kamensky v. Dean, 2005 WL 2224840, at *3 (11th Cir. Sept. 14, 2005) (unpublished) (citing Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1291 n.20 (11th Cir. 2000). "There is no one factor that is outcome determinative, but all factors must be taken into account." Stanley, 219 F.3d at 1291 n.20.  Despite the Plaintiff's characterization of this elimination as Angus's attempt to prevent him from giving his testimony to the Board, she stated that she agreed with his position on this issue and did not oppose his raising these concerns to the Public Works Committee.  (Angus Dep. at 145-46.) Furthermore, it was Roy Clack, the SPLOST manager, who made the decision to eliminate his position, and Clack has stated that he had no knowledge of the Plaintiff's concerns regarding the allocation of funds for SPLOST.  (Clack Dep. at 77-78.)

Schuster offers nothing to contradict these statements.  His assertion that this speech was a substantial motivating factor in the decision to terminate his employment is based entirely on the fact that his position was eliminated a week after Angus allegedly first learned of his plan to present his proposal to the Board.  The Plaintiff

cites <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739 (11th Cir. 1996), for the proposition that temporal proximity can alone demonstrate causation.  Although the opinion does state that such an inference is usually reasonable, the court goes on to establish that:

> It does not follow, however, that every time a person engages in constitutionally protected activity within a short time prior to an adverse employment decision that an inference may reasonably be drawn that they were related. <u>Every act of expression is not equally as likely to draw a negative response from an employer as every other; for the link to be made, it must be reasonable to assume that the employer had cause to retaliate.</u>

<u>Id.</u> at 745 (emphasis added).  The Court finds the Plaintiff's evidence alone fails to create a reasonable inference that he was fired in retaliation for his presentation before the Board.  Accordingly, none of the Plaintiff's speech is subject to First Amendment protection.  Because the Plaintiff has no claim, the Court need not address the issue of the Defendants' qualified immunity.

C. <u>State Law Claims</u>

The Plaintiff also claims that the Defendants' actions violated his rights under Article 1, Section 1, Paragraph 5 of the Georgia Constitution.  The Court declines to accept supplemental jurisdiction over this claim under 28 U.S.C. § 1367(c).  <u>See</u>

Mergens v. Dreyfoos, 166 F.3d 1114, 1119 (11th Cir. 1999) ("[T]his Court has noted that 'if the federal claims are dismissed prior to trial, Gibbs strongly encourages or even requires dismissal of state claims.'") (quoting L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984)).  This state law claim is thus dismissed without prejudice.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment [Doc. 63] is GRANTED.

SO ORDERED, this 6 day of June, 2007.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge